File Name: 06a0338n.06
Filed: May 12, 2006

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BRATT ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| NOBLE INTERNATIONAL, LTD.; | ) | DISTRICT OF OHIO |
| SET ENTERPRISES, INC., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before:     **MARTIN**, **NELSON**, and **COLE**, Circuit Judges.

**DAVID A. NELSON**, Circuit Judge.  This appeal presents two issues relating to the sale of a steel processing business.  The first issue is whether the buyer is entitled to summary judgment on the seller's claim that a contractual cap on the extent of the buyer's assumption of liability for the seller's accounts payable should be reformed on the ground that the parties were mistaken as to the likely amount of payables at the time of the sale.  The second issue is whether the buyer is entitled to summary judgment on the seller's claim that the buyer miscalculated a performance premium it had contracted to pay.  Like the district court, we conclude that both issues should be resolved in favor of the buyer.

I

In accordance with an asset purchase agreement dated September 30, 1998, Noble International, Ltd., through a subsidiary, acquired most of the non-cash assets of H & H Steel Processing Company, Inc. H & H Steel was in the business of "toll," or "value-added," steel processing, meaning that its customers normally shipped steel to H & H, retained title to the steel, and paid H & H for its processing services only. But H & H Steel had one customer, Arvin Sango, Inc., with whom it dealt on a "resale" basis; Arvin Sango sold steel to H & H and then repurchased it, with an appropriate markup, after it was processed by H & H.

The asset purchase agreement required Noble to assume certain liabilities of H & H Steel. H & H retained other liabilities, including "accounts payable in excess of $1,200,000." According to David Young, H & H Steel's chief financial officer at the time of the sale, trial balances generated by H & H on September 29, 1998, indicated that the company's accounts payable did not exceed $1.2 million. Because of transactions that had not yet been posted when H & H Steel generated the trial balances, however, the accounts payable turned out to be more than $1.8 million.

The asset purchase agreement also required Noble to pay H & H Steel a performance premium as part of the purchase price. The performance premium was to be "based upon the gross sales, net of returns and allowances, achieved by [Noble] in its annual operations for the business currently being conducted by [H & H Steel] and produced by one of [H & H Steel's] five existing plants in Ohio and Indiana or [certain other plants]."

Several disputes arose in connection with the asset purchase agreement. After various proceedings in federal district court, before an arbitrator, and in this court, two issues remained to be decided in the district court: (1) whether the asset purchase agreement should be reformed, on the basis of mutual mistake, to raise the $1,200,000 cap on Noble's assumed liability for accounts payable; and (2) whether Noble miscalculated its obligation to H & H Steel — now called BRATT Enterprises, Inc. — under the performance premium agreement.

With respect to the second issue, BRATT claimed that the cost of steel[1] resold by Noble, and not just the revenue attributable to Noble's processing services, should be counted as part of Noble's "gross sales." BRATT also claimed that steel processing sales from plants in Shelbyville, Kentucky and Chicago, Illinois, should have been included in the performance premium calculation.

Noble moved for summary judgment on both issues. The district court granted Noble's motion on the mutual mistake issue, holding that the risk of a mistake as to the amount of accounts payable should be allocated to BRATT. On the performance premium issue, the court granted Noble's motion in part and denied it in part. The court held that Noble's "gross sales" did not include the cost of steel resold after processing. The court

---

[1]The phrase "cost of steel," as used here and elsewhere in this opinion, refers to the difference between the total amount paid by a "resale" customer to Noble or H & H Steel and the markup for Noble"s or H & H's processing services. As we understand the record, that difference is equal to the amount paid by Noble or H & H for the unprocessed steel.

found there to be a triable issue, however, as to whether sales from the Shelbyville plant should be included in the calculation of BRATT's performance premium.

The parties stipulated to a dismissal of BRATT's claim with respect to sales from the Shelbyville plant, whereupon the district court entered final judgment. BRATT filed a timely appeal.

II

Under Michigan law, which the parties agree is applicable here, a court must ask two questions when deciding whether a contract should be reformed on the basis of mutual mistake. See *Lenawee County Board of Health v. Messerly*, 331 N.W.2d 203, 207 (Mich. 1982). The first question — whether the parties to the contract were mistaken as to a fact in existence at the time the contract was executed — is a factual one. See *id.* The second question — whether a particular mistake warrants rescission or reformation of the contract — is for the court to answer in its discretion. See *id.* at 208, 210; *Farm Bureau Mutual Ins. Co. v. Buckallew*, 685 N.W.2d 675, 680 (Mich. Ct. App.), *vacated on other grounds*, 690 N.W.2d 93 (Mich. 2004).

In answering the second question, the court should decide whether "the mistaken belief relates to a basic assumption of the parties upon which the contract is made, and which materially affects the agreed performances of the parties." *Lenawee County*, 331 N.W.2d at 209. But "[a] court need not grant rescission in every case in which the mutual mistake

relates to a basic assumption and materially affects the agreed performance . . . ." *Id.* at 210.
Of particular relevance here is the principle that rescission or reformation "is not available
. . . to relieve a party who has assumed the risk of loss in connection with the mistake." *Id.*
at 209-10.

On the record before us, we cannot say as a matter of law that BRATT and Noble
were not mistaken in their understanding as to the amount of BRATT's accounts payable at
the time of the sale. Both parties relied on trial balances showing accounts payable of about
$1 million. Although they knew there were likely to be unposted payables, the parties
believed that the final figure would not exceed $1.2 million — or so a reasonable fact-finder
could conclude. As we have seen, that belief proved to be mistaken.

We turn, then, to the question whether BRATT assumed the risk of a mistake as to the
amount of accounts payable. The Michigan Supreme Court has adopted § 154 of the
Restatement (Second) of Contracts, which states that

"[a] party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited
knowledge with respect to the facts to which the mistake relates but treats his
limited knowledge as sufficient, or

(c) the risk is allocated to him by the court on the ground that it is reasonable
in the circumstances to do so."

See *Lenawee County*, 331 N.W.2d at 210 n.12.

It seems to us that by agreeing to a cap on the accounts payable that would be assumed by Noble, the parties allocated to BRATT the risk that its payables would exceed the amount of the cap. The very nature of such a cap is to shift risk from the buyer to the seller, and the record shows that Noble wanted the cap for exactly that reason. Two of Noble's officers testified that Noble was "having trouble ascertaining . . . the specific amount" of accounts payable and that Noble insisted upon a cap in order to "protect [itself]." There is no evidence that the cap had any purpose other than to "protect" Noble by shifting risk to BRATT.

We also think that it is reasonable for BRATT to bear the risk of mistake, BRATT having generated the trial balances on which the parties based their understanding of the amount of payables and BRATT being in the best position to discover the extent to which the trial balances were incomplete.

It is true, as BRATT has argued, that enforcement of the $1.2 million cap results in a windfall of sorts to Noble. The unposted transactions that caused BRATT's accounts payable to exceed the cap by some $600,000 were transactions that generated accounts receivable of about $800,000. Noble stands to retain that $800,000 even as BRATT bears responsibility for the associated payables. But BRATT, which knew or should have known that additional payables would be accompanied by additional receivables, agreed to the cap on accounts payable without negotiating a corresponding cap on the accounts receivable that were transferred to Noble. In our view, therefore, the windfall to Noble is within the scope

of the risk assumed by BRATT; reformation is not warranted. See *Lenawee County*, 331 N.W.2d at 209-10.

III

The performance premium argument that BRATT presented in the district court dealt mainly with the question whether "gross sales," as used in the performance premium agreement, includes the cost of steel that Noble resold to Arvin Sango. BRATT does not press the Arvin Sango question here, however. BRATT's argument to this court, rather, is that "gross sales" includes the steel component of Noble's sales to Ford Motor Company — another "resale" customer, like Arvin Sango — from a former H & H Steel plant located in North Vernon, Indiana.

The district court held that sales to Ford were not "achieved by [Noble] in its annual operations for the <u>business currently conducted by</u> [H & H Steel]." This holding was based on the fact that H & H Steel had made no sales to Ford from the North Vernon plant; such sales occurred only after the plant was acquired by SET Enterprises, Inc.,[2] which had a pre-existing relationship with Ford.

Unlike the district court, we think a reasonable jury could interpret "business currently conducted by [H & H Steel]" to mean the type of work performed by H & H Steel — *i.e.*,

---

[2]SET acquired the North Vernon plant when it merged with the Noble subsidiary that had purchased H & H Steel.

steel processing — regardless of the identity of the customer for which the work was done. Given that Noble's work for Ford at the North Vernon plant involved steel processing services similar to those previously performed by H & H Steel, we are not persuaded that Noble is entitled to judgment as a matter of law on the ground relied upon by the district court.

But we think the logic that led the district court to conclude that the cost of steel resold to Arvin Sango should be excluded from "gross sales," as that term is used in the performance premium agreement, also applies to the cost of steel resold to Ford.

Under the agreement, "gross sales" must be "for the business currently being conducted by" H & H Steel. H & H Steel was in the business of processing steel, not wholesaling it. Significantly, H & H "washed out" the cost of steel in its accounting of sales to its one "resale" customer, Arvin Sango, recognizing as revenue only the payments attributable to its processing services. Richard Balgenorth, a vice president of Noble and its chief negotiator in the purchase of H & H Steel, was aware of this accounting practice; in his words, "only the toll processing revenue was part of the revenue of [H & H Steel,] which [wa]s consistent with the way that H & H did all of its other business." Thus, both parties to the performance premium agreement understood that the "gross sales" generated by H & H Steel's "business" did not include sales of steel.[3]

---

[3]Mr. Balgenorth testified to his understanding that "a hundred percent of the business being conducted by [H & H Steel] was value-added sales."

In keeping with this understanding, Dominic Sarno, the president of H & H Steel when it was acquired by Noble (and now an officer of SET), declared under penalty of perjury that the performance premium was to be "calculated without including the cost of any steel."[4] Mr. Balgenorth testified to the same effect: "[t]here is . . . zero doubt in my mind that the value-added portion [of "resale" transactions] is what was contemplated . . . . [T]here was never any contemplation of putting any steel sales in any performance premium amount." Were steel sales to have been included, Mr. Balgenorth explained, the sales levels that triggered BRATT's right to more than the minimum performance premiums would have been set much higher.

We think that this evidence, which is uncontradicted in the record, compels a finding that the steel component of sales to any "resale" customer — whether Arvin Sango or Ford — falls outside the contractual meaning of "gross sales." BRATT stresses that Noble (*i.e.*, SET) accounts for its "resale" transactions differently than H & H Steel did; SET includes the cost of steel when recognizing revenue from sales to Ford. But this fact cannot change the meaning of the performance premium agreement, which was negotiated against the backdrop of H & H Steel's business and accounting practices, not SET's, and which ties "gross sales" to H & H Steel's "business." As used in the performance premium agreement,

---

[4]Mr. Sarno confirmed in his deposition that the performance premium was to be based "on value-add sales."

"gross sales" excludes the steel component of sales to Ford. The judgment in favor of Noble

will be affirmed on that basis.

**AFFIRMED**.